UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Judy R. Butler,

        Plaintiff,

     vs.                      REPORT AND RECOMMENDA-
TION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

           Defendant.        Civ. No. 04-2608 (JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's

final decision, which denied her application for Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI"). The matter is now before the Court upon

the parties' cross-Motions for Summary Judgment. For these purposes, the Plaintiff

has appeared by Randall J. Fuller, Esq., and the Defendant has appeared by Lonnie F.

Bryan, Assistant United States Attorney. For reasons which follow, we recommend

that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion be granted.

## II. Procedural History

The Plaintiff filed applications for DIB and SSI on August 22, 2002, which alleged that she had become disabled on June 23, 2002.  [T. 51-53, 248-50].  Her claims were denied upon initial review, and upon reconsideration.  [T. 25-28, 251-56].

On December 26, 2002, the Plaintiff requested a Hearing before an Administrative Law Judge ("ALJ") and, on June 3, 2003, a Hearing was conducted, at which the Plaintiff appeared personally, and by legal counsel.[1]   [T. 257-90]. Thereafter, on August 25, 2003, the ALJ issued a decision which denied her claim for benefits.  [T. 14-24].  The Plaintiff requested an Administrative Review before the Appeals Council which, on March 20, 2004, declined to review the matter further.  [T. 7-9].  Thus, the ALJ's determination became the final decision of the Commissioner. Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §1481.  This action was commenced on April 30, 2004.

---

[1]The Plaintiff's legal counsel, at the Hearing, is not the same individual who currently represents her.

### III.   Administrative Record

A.   Factual Background.   At the time of her alleged onset of disability, the Plaintiff was 61 years old.  [T. 22, 51, 55, 248, 261].  The Plaintiff had graduated from high school, had attended two years of college, and one year of beauty school, and had past relevant work experience as a care giver, teaching assistant, and data entry/ processor clerk.  [T. 66, 71, 78-85, 264-66, 268].  As related by the Plaintiff, she stopped working on June 11, 2002, because she had progressively found her job, as a special education teaching assistant, more difficult, and she could no longer perform her duties.  [T. 65].  The Plaintiff alleges that she suffers from osteoarthritis, degeneration of the spine, and hips, double vision, and dizziness, and she notes that multiple sclerosis ("MS") has not been ruled out.  Id.  She further alleges that those illnesses prevent her from doing any repetitious movements, and from sitting, or standing, for too long at one time.  Id.

At the outset, we note that the Plaintiff has not challenged the ALJ's determination of her impairments, or of her residual functional capacity ("RFC").[2]

---

[2]RFC is defined as the most an individual can still do after considering the effects of physical or mental limitations that affect that individual's ability to perform work-related tasks.  20 C.F.R. §§404.1545.

Accordingly, we need not engage in an exhaustive recitation of her medical background, as we normally would, in such matters.  The Plaintiff's medical records begin in April of 1998, when the Plaintiff complained of head and shoulder stiffness, as well as pain in the back of her scalp, which radiated into her shoulder.  [T. 130]. An examination revealed no adenopathy, or thyromegaly, and she displayed a full range of motion, and normal grip strength.  Id.  However, the Plaintiff demonstrated increased pain with flexion, extension, and lateral bending and twisting.  Id.  She was diagnosed with cervical neck strain, and she was instructed to take Aleve, and do gentle range of motion exercises.  Id.  In addition, she was given a prescription for Darvocet.[3]

Beginning in October of 1998, the Plaintiff complained of dizziness, over the previous six months, and she noted that she had been diagnosed with possible benign positional vertigo.  [T. 127-28].  In November of 1998, a neurological physician suspected that the Plaintiff might have MS, based on her dizziness, and a history of the illness, in her extended family.  [T. 165].  The physician noted that an MRI scan had

---

[3]Darvocet "is a centrally acting narcotic analgesic agent," which is "indicated for the relief of mild to moderate pain."  Physicians' Desk Reference, p. 402 (59th Ed. 2005).

- 4 -

been performed, which was consistent with either vascular disease, or MS, but it was his opinion that the condition was a demyelinating disease, and he arranged for a spinal tap.  Id.  He further noted that the Plaintiff had her eyes examined, which revealed no visual abnormality that would explain her condition.  Id.  He recorded that the Plaintiff had normal strength, and that there were no abnormalities with neck flexion, or extension.   [T. 164].   Approximately two weeks later, the physician noted the Plaintiff's history of left rotator cuff problems, a lumbar fusion, and longstanding neck problems, and he opined that the Plaintiff had a very mild dysmetria.  [T. 162-63].  A duplex ultrasound of the Plaintiff's carotid arteries, which was also performed in November of 1998, was normal, and did not reveal any stenoses.  [T. 149].

In December of 1998, the Plaintiff underwent a lumbar puncture, which was performed without any apparent complications, and no malignancy was identified.  [T. 137-47, 159-62].  Cerebrospinal fluid was negative for demyelinating disease, but the MRI scan revealed a diffuse disease, which was suggestive of a small-vessel disease. [T. 159].  The Plaintiff was instructed to use Meclizine,[4] with which she had noticed

_____

[4]Meclizine hydrochloride is "an antihistamine used as an antiemetic in the management of nausea, vomiting, and dizziness associated with motion sickness." Dorland's Illustrated Medical Dictionary, p. 1069 (29th Ed. 2000).

some improvement in her dizziness, and to ice her neck, as her physician felt that the neck might be a factor. [T. 159, 161]. When she visited her physician shortly thereafter, he noted that there had been a recent diagnosis of MS, but it appears to be noted as questionable, and she was not on any medications for it. [T. 120-21]. The Plaintiff also complained of multiple joint arthralgias. [T. 121]. The Record is replete with the Plaintiff's complaints of dizziness, and pain in her head, neck, back, shoulders, hips, and knees, from 1998 through her most recent medical records. [T. 151-55, 166-217, 246-47].

In January of 1999, Dr. Craig Hyser examined the Plaintiff, and reviewed her medical history, which included diplopia and visual blurring, that could not be corrected aside from prisms, and for which she did not see a neurologist, as had been recommended; pain and weakness in her left shoulder, which improved following a rotator cuff repair; weakness in her right hand, for which she underwent a carpal tunnel release; asthma; and lumbar fusion. [T. 154-55]. Dr. Hyser stated that the head MRI scan, of the Plaintiff, showed extensive white matter changes, and he gave her a prescription for Prednisone.[5] Id. While the Plaintiff reported that her symptoms of

---

[5]Prednisone is "administered orally as an anti-inflammatory and
(continued...)

imbalance, and dizziness, had improved, she had a new symptom of "'black lines' in her vision," which were described as "'squiggles' with occasional lightning bolts."  [T. 153].  The Plaintiff's neurological examination, and cranial nerve testing, revealed full visual fields to confrontation, and visual acuity was 20/30 on the right, and 20/20 on the left.  Id.  Funduscopic examination showed sharp discs bilaterally.  Id.

When Dr. Hyser again saw the Plaintiff, in February of 1999, he noted that she had a small meningioma next to the falx, but her spinal fluid analysis was unremarkable, there were no oligoclonal bands, the IgC index was normal, and her carotid ultrasound was unremarkable.  [T. 151].  The Plaintiff had been seen by an eye doctor, who had told her that she had vitreous floaters.  Id.  Although she continued to have a sense of disequilibrium, the Plaintiff reported that she was no longer dizzy, and she was not on any medications.  Id.  Upon examination, the Plaintiff was essentially normal, and Dr. Hyser stated that he could not, with certainty, diagnose her with MS.  Id.  He further opined that the Plaintiff was stable, and he could see no reason why she would not be able to return to work.  Id.

---

[5](...continued)
immunosuppressant in a wide variety of disorders."  Dorland's Illustrated Medical Dictionary, at 1450 (29th Ed. 2000).

The Plaintiff had an MRI of her cervical spine, in May of 1999, which revealed left-sided foraminal stenosis at C6-7, moderate right-sided foraminal narrowing at C5-6, and at C6-7.  [T. 181].  She was diagnosed with cervical disc disease, or degenerative joint disease, as early as July of 1999.  [T. 214].  She was also variously diagnosed with asthma, and chronic obstructive pulmonary disease ("COPD"), and she had a cholecystectomy, in January of 2002.  [T. 171-73, 202].

An electromyography ("EMG"), and nerve conduction studies, were conducted in September of 2000.  [T. 157].  The results of the nerve conduction studies were normal, but the EMG revealed mild acute left C7 radiculopathy with changes in the pronator teres, flexor carpi radialis and triceps.  Id.  From 2000 to 2002, the Plaintiff was seen on numerous occasions, with various complaints similar to what has previously been described.

On August 7, 2002, Dr. T. L. Lundsten treated the Plaintiff for complaints of headaches, with associated vision problems, where she was unable to focus.  [T. 217].  The Plaintiff was taking between three, and nine tablets of Excedrin per day.  Id.  He described the Plaintiff's history as inclusive or chronic cervical arthritis, and severe

arthritic disease, and he noted that the Plaintiff had a prescription for Salicylate.[6]  Id.

Dr. Lundsten observed that the Plaintiff had diffuse cervical posterior neck tenderness,

with crepititus, and decreased range of motion.  Id.

A State Agency physician evaluated the Plaintiff's RFC, in September of 2002,

and found that she could lift twenty pounds occasionally, and ten pounds frequently,

could stand, walk or sit, for six hours in an eight hour workday, and had an unlimited

ability to push and pull.  [T. 220].  In addition, the physician restricted the Plaintiff

from being exposed to hazards, such as unprotected heights, due to her complaints of

dizziness.  [T. 223].  No other limitations were noted.  [T. 219-27].

The Plaintiff also underwent a psychiatric examination, in November of 2002,

by Dr. Alford S. Karayusuf.  [T. 229-31.  Dr. Karayusuf noted that the Plaintiff was

not being treated by a psychiatrist or a counselor, was not on any psychotropic

medication, and did not report any depression or anxiety, although she stated that she

tends to be anxious, and worries.  [T. 229].  However, she had briefly attended family

counseling, in 1991, to cope with the behavioral problems of her son.  Id.  The Plaintiff

------

[6]Salicylate has "analgesic, antipyretic, and anti-inflammatory activity," and it "act[s] by inhibiting prostaglandin synthesis."  Dorland's Illustrated Medical Dictionary, at 1594 (29th Ed. 2000).

reported that she had difficulty sleeping, in that she only got two to five hours of sleep per night, and her concentration and memory were diminished.  Id.

Dr. Karayusuf also recorded the Plaintiff's activities.  [T. 229-30].  He noted that she saw her children twice a week, and she bathed, and made her bed every day.  She cooked for herself, went grocery shopping once or twice per month, dusted once or twice per week, did laundry once per week, and did dishes twice per day.  Id. However, she did not vacuum, or do yard work.  [T. 230].  The Plaintiff did not go to church, or to the movies.  Id.  She played cards two to six times per week, with her husband, relatives, and friends, watched television up to two hours per day, and was able to remember what she watched, crocheted and embroidered up to six hours per day, and visited with friends on the telephone two to three time per week.  Id.  Upon examination, the Plaintiff displayed good immediate digit recall, and could recall seven digits forward, and four digits backward, she could remember the names of four out of the five previous Presidents, in correct order, and she was able to subtract serial sevens accurately, and with average speed.  Id.  However, the Plaintiff was only able to recall one out of three unrelated objects after five minutes, and Dr. Karayusuf found that her recent recall was impaired.  Id.

Overall, Dr. Karayusuf did not provide a diagnosis of the Plaintiff, and noted that her prognosis, concerning her psychiatric condition, was good.  [T. 230].  He concluded that she was able to understand, retain, and follow simple instructions; she was able to interact appropriately with fellow workers, supervisors, and the public; and she was able to maintain pace and persistence, in the performance of simple, routine, repetitive, concrete and tangible tasks.  [T. 230-31].  A State Agency physician, in December of 2002, opined that the Plaintiff had no medically determinable impairments.  [T. 232-45].

B.    Hearing Testimony.  The Hearing on June 6, 2003, commenced with some opening remarks by the ALJ.  [T. 259-61].  The Plaintiff testified that she was born on May 16, 1941, which made her sixty-two years old at the time of the Hearing.  [T. 261].  She affirmed that the address on file was correct, and that she had lived there permanently, since November of 2002, when she moved from St. Paul, Minnesota.  Id.  The Plaintiff is right-handed, weighs 190 pounds, and is four feet, eleven inches tall.  [T. 261-62].

The Plaintiff testified that she sold her home in St. Paul, because it had two stories, with the bedrooms upstairs, and the Plaintiff had to crawl up the stairs, in order to get to bed.  Additionally, her husband became unemployed, which necessitated

selling either the house in St. Paul, or the home to which they had moved, which is a one-story cabin.  [T. 262].  Faced with that decision, they opted to sell the house that the Plaintiff could not handle.  Id.  The Plaintiff testified that she could not walk up the steps, due to problems with her back, and hips, and that there were times when she could not lift her legs enough to be able to climb stairs.  Id.  She described the feeling not so much as pain, but rather that her legs felt heavy.  Id.  Her doctor told her that she had been fighting her pain for so long, that she did not pay attention to it anymore, and it made her body tired.  [T. 262-63].

The Plaintiff was married, and her husband had essentially retired, after his employer went bankrupt.  [T. 263].  Therefore, he was receiving Social Security Retirement benefits, and had just received his second check.  Id.  The Plaintiff testified that she did not receive similar benefits, not having applied for them, and she had only applied for Disability.  [T. 263-64].  She did not receive money from any other source. [T. 264].

The Plaintiff last worked in June of 2002, as a special needs teaching assistant, which involved directing, re-directing, and helping special needs children, including one who had Down's Syndrome.  [T. 264].  The job was within the St. Paul school system, and it stopped when the Plaintiff could no longer tolerate running after the

children, on the cement floors, bending, stretching, and sitting.  [T. 264-65].  The Plaintiff explained that it was a physical job, at times, and, although her coworkers tried to cover for her, it did not work, and she retired from the school district.  [T. 265].  When asked whether she was receiving a pension, she replied that she was trying to complete the paperwork, which required the birth certificates of both her, and her husband, and she was just in the process of finding them, because she had a lot of items in storage, due to the move.  Id.  However, she stated that her pension would only amount to approximately $50 per month, because she had not worked with the school district for very long.  Id.

Prior to her job with the school district, the Plaintiff was employed at Friendship Manor Home, in Eau Claire, Wisconsin, which was an assisted living home.  [T. 265-66].  In that position, the Plaintiff worked with the elderly, made meals, and helped with their personal care.  [T. 266].  Before that, she worked in home care for three to five years, which involved duties such as taking the elderly, and/or disabled, to their doctors' appointments, and helping them with their checking accounts.  Id.  Progressing backward, the Plaintiff stated that she had worked at Menards, as a data processor, but she was laid off and, in any event, she was having a lot of problems with double vision in her eyes, and trying to work the computer.  [T. 266].  Since then,

- 13 -

the Plaintiff had prisms in her glasses, which helped with the double vision. [T. 266-67]. The Plaintiff further testified that, for data processing, she sometimes became very dizzy, when she turned her head quickly. [T. 267].

The Plaintiff testified that she had a driver's license, but had not driven since her eye surgery in May, or June of 2002. [T. 267]. She continued to have trouble focusing, which might have been due to her eyes, or her neck, and she noted that she had scheduled an appointment for the tenth of the month. Id. The Plaintiff further stated that she had graduated from high school, and had attended two years of college. [T. 268]. She lived with her husband, and their dog, and she stated that she was able to get up in the morning, clean up, and get dressed. Id. Although the Plaintiff was able to cook, she could only do the laundry with help in folding, and carrying the laundry. Id. The Plaintiff was also able to go grocery shopping, as long as she had a cart to push, but she did not go to the shopping mall, nor did she vacuum, because of her back. [T. 268-69]. She stated that she was able to walk to the lake, which was across the road from her house, and to the mailbox, but she could not stay on her feet for very long, because it made her hips, and her back ache. [T. 269]. The Plaintiff estimated that she walked no further than two blocks at a time. Id. She also attended

church, approximately three or four times per year, which was not as often as she would have liked.  Id.

The Plaintiff stated that she smoked between a pack, and a pack and a half, per day.  [T. 269-70].  Although she had tried to quit several times, it had not worked, and she complained that she gained too much weight, and that she was heavy enough, as it was.  [T. 270].  The Plaintiff stated that she sometimes slept okay, but she did not take anything to help her sleep.  Id.  With regard to her medications, the Plaintiff confirmed that she took Nexium[7] for her stomach, Lipitor[8] for hyperlipidemia, and Salicylate, which is a salicitic acid, related to aspirin, and which was not a prescription medication, for her arthritis.  [T. 270-71].

To pass the time, the Plaintiff crocheted, embroidered, read, when she could see the material, watched television, played cards, and colored with her grandchildren.  [T. 271].  However, she was not able to do the same things with her grandchildren, as she used to do, such as run, play, go for walks, fish, and take them to the lake.  Id.  The

_____

[7]Nexium "is indicated for the short-term treatment * * * in the healing and symptomatic resolution of diagnositically confirmed erosive esophagitis."  Physicians' Desk Reference, at 623 (59th Ed. 2005).

[8]Lipitor is indicated in "adult patients without clinically evident coronary heart disease, but with multiple risk factors for coronary heart disease."  Physicians' Desk Reference, at 2587 (59th Ed. 2005).

Plaintiff testified that both she, and her husband, were home during the day.  Id.  She cooked, but he helped take the food, and the pans from the cupboard, and she washed the dishes, while he dried them, and put them away.  Id.  Basically, the Plaintiff performed light housework, such as dusting, and her husband performed the heavier work, such as vacuuming, and he did everything that she could not do.  [T. 272]. When asked whether she and her husband had been out of Minnesota at all, in the previous year, the Plaintiff replied that they had only driven to Wisconsin in order to attend funerals, and that they usually stayed overnight, because she did not travel well. Id.  She stated that she did not go on any vacations, such as to Disneyland, even with her grandchildren.  [T. 272-73].

The ALJ asked the Plaintiff to explain the biggest reason why she was unable to work, to which she replied that she could not do the job that she would like to do, nor could she get there.  [T. 273].  When she was asked to ignore those problems, she stated that another problem was that she could not sit for very long.  Id.  The Plaintiff elaborated that she could only sit for a half hour, before she needed to move, and that she had to be able to pace herself, in that, when she needed to get up, she had to do so, and the same was true for sitting.  Id.  If she sat for too long, her neck, and butt ached, she had the same kind of feeling, in her lower back, as she did before her back

- 16 -

surgery.  [T. 274].  The Plaintiff stated that the lumbar fusion occurred in May of 1977, and she had been doing well until she started aging, approximately two to three years earlier.  Id.  The Plaintiff further testified that she could sit for a longer period of time, than she could stand, but it was not always the same, and she could not walk more than two blocks .  [T. 274-75].  She added that she did not like to go anywhere by herself, because her balance was not good, and she felt clumsy.  [T. 275].

The Plaintiff could sometimes pick up a gallon of milk, but not at other times, due to its weight, and she stated that she could not explain it, but things got so heavy, at times, such as her arms and legs.  [T. 275].  When the ALJ asked her whether she could do buttons, tie shoes, and eat with a knife and fork, the Plaintiff responded that she tried to stay away from buttons, because she could not fasten them if they were too small, or tight, and she usually wore shoes that did not need to be tied.  [T. 275-76].  The Plaintiff further related that bending over bothered her, and that it caught in her hips, which caused pain in both her hips, and lower back.  [T. 276].

Next, the Plaintiff's attorney asked her some questions.  When the Plaintiff tried to do things around the house, such as crocheting, she sometimes had problems, but that she tried to keep her hands active, because she had been doing crafts, since she was five years old.  [T. 276].  She further stated that she had not typed in years, and

that she did not write like she used to.  Id.  Her attorney asked her why she did not

type, and the Plaintiff replied that she had not typed since her data processing job, and

it made her too dizzy to look back and forth, from a screen to a piece of paper.  [T.

277].  The Plaintiff's doctor had opined that the dizziness was a result of the arthritis

in her neck, which pinched her nerves.  Id.

The Plaintiff testified that she did not think that she could be somewhere, such

as a job, for eight hours per day, because she did not have the energy.  [T. 277].  The

Plaintiff explained that she became so extremely tired, that she could not lift her arms

and legs, and she had to pace herself in order to do things as best as she could.  [T.

278].  The Plaintiff reiterated the opinion of her doctor that the fatigue was a result of

her fighting the pain so much, that her body was going to stop her one way or another,

because it knew that it was in pain.  Id.  The areas of her body, where she had pain,

were in her neck, the back of her head, her lower back, and her hips.  Id. When asked

if she laid down during the day, the Plaintiff replied that she took quite a few rest

breaks throughout the day, but she was not one to sleep.  Id.

The Plaintiff testified that she still had headaches off and on, for which she had

received samples of two different prescriptions, one of which helped, and one of

which did not.  [T. 276].  The Plaintiff's attorney asked her whether there were any

other problems, which had not been discussed, to which she replied that it seemed like all she had was problems, but she could not think of anything specific.  [T. 279].  The Plaintiff stated that the only exercise she did was a little walking, she seldom drank alcohol, and she did not take any illegal drugs.  Id.

The Hearing continued with the testimony of Dr. Andew Steiner, who was the medical expert ("ME").  The ALJ referenced one of the Plaintiff's medical records, and asked the ME to explain what it meant that "a needle examination shows evidence of mild acute left C7 radiculopathy with changes in the pronator teres, [flexor] carpi, radialis and triceps."  [T. 279-80].  The ME responded that the test was one of motor activity, in those muscles, which had indicated some impairment of the motor enervation to those muscles -- namely, the C7 level in the neck.  [T. 280].  The ME stated that there had been some evaluation for neck pain, and headaches.  Id.  The ALJ commented that the record was from September of 2000, and that he had not seen that subsequently repeated.  Id.  The ME also confirmed that the phrase "mild acute" meant that the problem began suddenly, and he reiterated that there had been an evaluation of the arthritic impingement problems, in the Plaintiff's neck.  Id.  However, he stated that it was unaccompanied by any objective clinical loss, and so he would not attribute

much significance to it.  Id.  The ME further testified that no follow-up EMGs were performed.  [T. 280-81].

The ME testified that there had been evaluations for dizzy spells, and visual problems, and that there was some question of MS, because of some changes on the MRI, and light matter changes, but that possible diagnosis had never been proven.  [T. 281].  When the ALJ stated that the physicians never found any objective evidence of MS, the ME clarified that the MRI studies suggested it, but there was not enough proof to make a diagnosis, and it was never confirmed by a second physician.  Id. Associated with that, there were some findings of mild dysmetria of the right upper extremity.  Id.  The ME described the condition as "[a] disorder of an ability to use -- the measurement as you do activities with an extremity that is -- reaching out," and when "[y]ou don't reach out exactly, correctly, that would be dysmetria."  [T. 282]. However, the ME stated that it was not "clumsiness."  Id.  The ME reiterated that the problem was mild, and he did not know whether it was persistent.  Id.

Additionally, the ME stated that the Plaintiff had evaluations for neck pains, and headaches, which were associated with some findings of osteoarthritis and degenerative disc disease of the neck region, and some loss of range of motion, along with the EMG changes, but there were not any real objective neurological, clinical

losses.  [T. 282].  By that, the ME meant that there was no reflex, specific sensory, or motor loss.  Id.  The ME also noted the Plaintiff's asthma, possible COPD, and back, hip and knee pain, with which no neurological loss was associated.  Id.  The ME testified that the etiology of the Plaintiff's conditions was unclear, and that he had not noticed anything in the Record, about the Plaintiff's fusion, or the results of that surgery.  Id.

The ME testified that, in terms of any ongoing significant neurological loss, the Plaintiff's impairments did not meet the Listings.[9]  [T. 282-83].  Based on the Plaintiff's age, neck arthritis and dizziness, the ME opined that she would have "sedentary residual" functional limitations.  [T. 283].  In addition, he stated that unprotected heights, and hazardous machinery would be precluded, and that the Plaintiff's asthma required a consideration of the air quality.  Id.  Finally, the ME testified that there was no solid evidence of any upper extremity limitations, and that his analysis was appropriate, since June of 2002.  Id.

---

[9]Appendix 1 contains a Listing of Impairments that identifies a number of different medical conditions, and describes a required level of severity for each condition.  If the required severity is met, the claimant is found disabled without considering vocational factors.

The Hearing continued with the testimony of L. David Russell, who was the vocational expert ("VE").  The VE testified that he was familiar with the jobs that existed in the region, which he generally referred to as the State of Minnesota.  [T. 283-84].  The VE began by asking the Plaintiff whether she had attended beauty school, to which the Plaintiff responded that she had, and she had worked in the field for six months, forty-three years earlier.  [T. 284].

The ALJ interrupted to inquire of the ME whether the Plaintiff's dizziness, and "neck thing," would preclude a continuous rotation, or flexion of the neck.  Id.  The ME responded that "[t]hat would be a report[,] [a]nd, like a headache," but that no limitations on the motion of the neck were necessary, other than to potentially exclude overhead work.  [T. 284-85].  The Plaintiff's attorney sought to clarify the ME's response, by asking whether the comparison between the dizziness, and the headaches, was based on the objective record, as opposed to the reports.  [T. 285].  The ME responded affirmatively, and stated that he thought there were consistent reports of dizziness, and vertigo symptoms, possibly due to some MS problems, and that there was some labyrinthitis, but there was no actual testing, as documentation.  Id.  The ME noted that one examiner had found some slight problems with balance, but that there were no consistent clinical findings to support any limitations, based on the report.  Id.

- 22 -

Returning to the VE, the ALJ asked him to assume a woman in her early sixties, with a high school education, and work experience, as set forth in the VE's report.  [T. 285].  The individual was impaired by occasional dizzy spells, and double vision; some mild dysmetria of the right upper extremity; neck pain and headaches, secondary to arthritis in her neck; asthma; back, hip and knee pain; and status post lumbar fusion in 1977.  [T. 285-86].  The ALJ imposed limitations of lifting ten pounds occasionally, and five pounds frequently, standing and/or walking for two hours, and sitting for six hours, in an eight hour workday, with a thirty minute sit/stand option, and no overhead work.  [T. 286].  In addition, the ALJ prohibited work where there were concentrations of dust, smoke, or chemical fumes.  <u>Id.</u>  Within that hypothetical, the VE opined that the individual could perform some of the Plaintiff's past relevant work, even with the sit/stand option.  <u>Id.</u>

Next, the ALJ added that the individual could only use her upper extremities for fifty per cent of the workday, and only up to a maximum of thirty minutes at a time, as well as only occasional head rotation, or neck flexion.  [T. 286].  With the added limitations, the VE testified that the limitation on the use of the hands, but not the head and neck posturing, would preclude the data processing job, and the individual could not perform any of the Plaintiff's past relevant work.  <u>Id.</u>

- 23 -

The VE testified that the Plaintiff had some transferable skills, in that the Plaintiff had responsibility for phoning and filing, in her position at Menards, which would transfer into the logical job family of a receptionist, or information clerk, which were sedentary positions.   [T. 286-87].   He identified the transferable skills as greeting, phones, and maintaining records, or record-keeping.   [T. 287].   In the case of the information clerk, and receptionist, it would primarily involve taking messages.   Id. The VE testified that the jobs were sedentary, and semi-skilled, and that there were approximately 25,000 positions available in the State of Minnesota, of which he would eliminate 7,000 of those jobs, given the ALJ's limitations.   [T. 287-88].   The VE confirmed that the jobs fit the limitations, based on his knowledge of how those jobs are performed, in the State of Minnesota.   [T. 288].   In addition, the VE testified that the jobs would require only a minimal vocational adjustment, because the Plaintiff's background included quite a bit of public contact, and working individually with people, and she also had an office background, which would make the transition go more smoothly.   Id.   The VE stated that he considered vocational adjustment, in terms of tools, work processes, work settings, and the industry, in providing his testimony. [T. 288-89].

The Plaintiff's attorney mentioned a symptom of fatigue, and asked the VE whether competitive employment would be precluded, if the individual needed to leave the job early, one day a week, due to fatigue.  [T. 289].  The VE responded that it would jeopardize most employment situations, particularly if the instances were unscheduled, and unpredictable.  Id.  With that, the Hearing concluded.

C.    The ALJ's Decision.  The ALJ issued his decision on August 25, 2003.  [T. 14-24].  As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §§404.1520 and 416.920.[10]  As a

---

[10]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

(continued...)

threshold matter, the ALJ concluded that the Plaintiff had not engaged in substantial

gainful activity since the date of her alleged onset of disability of June 23, 2002.  [T.

18].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical

or mental impairments, which would substantially compromise her ability to engage in

work activity.   After considering the Plaintiff's medical history, and the testimony

adduced at the Hearings, the ALJ found that the Plaintiff was severely impaired by

dizziness, blurred vision, mild dysmetria of the right upper extremity, degenerative joint

disease of the cervical spine, with residual pain, asthma, and a history of degenerative

disc disease of the lumbar spine, status post lumbar fusion.  [T. 18].

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the

impairments contained in Appendix 1, Subpart P of the Regulations.[11]  See, <u>20 C.F.R.</u>

---

[10](...continued)
A claimant is disabled only if he is not engaged in substantial gainful activity; he has
an impairment that limits his ability to perform basic work activities; and his impairment
is either presumptively disabling, or he does not have the residual functional capacity
to perform his previous work, and he cannot perform other work existing in the
national economy.  <u>Id.</u> at 754.

[11]Appendix 1 contains a Listing of Impairments that identifies a number of
different medical conditions, and describes a required level of severity for each
condition.  If the required severity is met, the claimant is found disabled without
(continued...)

§404.1520(d) and 416.920(d).  He determined that the Plaintiff's impairments did not

meet, or equal, the criteria of any Listed Impairment.  [T. 18].

The ALJ then determined the Plaintiff's RFC.  [T. 18-19].  The ALJ recognized

that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the

Plaintiff's symptoms, including the Plaintiff's subjective complaints of pain, and that

those complaints were to be evaluated under the standard announced in Polaski v.

Heckler, 739 F.2d 1320 (8th Cir. 1984).  The ALJ found the Plaintiff's allegation,

concerning her limitations, to be not entirely credible, because the medical evidence did

not support the Plaintiff's claims of total disability, her daily activities were inconsistent

with total disability, and her work history, which was consistent with part-time work

in most years, reflected the Plaintiff's lack of interest, or need for full-time

employment.  [T. 21].

After considering the testimony at the Hearing, the opinions of the Plaintiff's

treating physicians, the objective medical evidence, and the Plaintiff's subjective

complaints, the ALJ found the Plaintiff's RFC to be as follows:

---

[11](...continued)
considering vocational factors.

> [T]he claimant retains the residual functional capacity to perform sedentary work; with lifting 10 pounds occasionally and 5 pounds frequently; standing and walking for up to 2 hours out of an 8 hour day, with a 30 minute sit stand option; sitting for up to 6 hours out of an 8 hour day; with no overhead work; no work in areas with concentrations of dust, smoke, chemicals or fumes; only occasional head rotation or flexion of the neck; performing tasks with her hands for only 50 percent of the work day, and for no more than 30 minutes at one time.

[T. 18-19].

Proceeding to the Fourth Step, the ALJ found that the Plaintiff could not perform her past relevant work. [T. 22].

Accordingly, the ALJ noted that the burden shifted to the Commissioner to establish the final step; namely, whether there are other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given her RFC, age, education and work experience. [T. 22]. The ALJ noted that the Plaintiff was 61 years old at the time of her alleged disability onset, which is defined as an individual closely approaching retirement age. Id., citing 20 C.F.R. §§404.1563, and 416.963. The ALJ noted that, considering the Plaintiff's age, education, past relevant work experience, and RFC, the VE had opined that the Plaintiff could perform work as an information clerk, or receptionist, of which there were 7,000 jobs in the regional economy. Id. The VE also testified that the Plaintiff would need to make only a minimal vocational

- 28 -

adjustment, in order to perform those jobs. Based on the testimony of the VE, and taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled and, therefore, was not entitled to a period of disability, DIB, or SSI. [T. 23-24].

## IV. Discussion

A. Standard of Review. The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole. See, Title 42 U.S.C. §405(g); see also, Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir. 1997). This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision. See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Newton v. Chater, 92 F.3d 688, 692 (8th Cir. 1996), and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998). On review, a Court must take into consideration the weight of the

evidence, apply a balancing test, and determine whether or not substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001); <u>Jackson v. Apfel</u>, 162 F.3d 533, 536 (8th Cir. 1998); <u>Black v. Apfel</u>, 143 F.3d 383, 385 (8th Cir. 1998).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision." <u>Banks v. Massanari</u>, 258 F.3d 820, 822 (8th Cir. 2001).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  <u>Howard v. Massanari</u>, 255 F.3d 577, 581 (8th Cir. 2001), quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996); see also, <u>Fenton v. Apfel</u>, 149 F.3d 907, 910 (8th Cir. 1998); <u>Scott v. Chater</u>, 112 F.3d 367, 368 (8th Cir. 1997).  Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-

of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions and, therefore, it embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.  See, Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

B.    Legal Analysis.  In support of her Motion for Summary Judgment, the Plaintiff advances the following arguments:

1.      The ALJ's Finding, that the Plaintiff Can Perform Other Substantial Gainful Activity, is not Supported by Substantial Evidence Due to Reliance upon Flawed Vocational Testimony.

2.      The ALJ Erred in Failing to Apply Relevant Vocational Rules which would have Led to a Finding that the Plaintiff is Disabled.

3.      The ALJ Erred in Improperly Discounting the Testimony or Reports of the Plaintiff Regarding Her Impairments and Functional Ability by Failing to Use the Proper Legal Standard.

We first consider the Plaintiff's arguments concerning the evaluation of her credibility, and we then proceed to the Plaintiff's remaining arguments, collectively.

1.      <u>Whether the ALJ Erred in Improperly Discounting the Testimony or Reports of the Plaintiff Regarding Her Impairments and Functional Ability by Failing to Use the Proper Legal Standard</u>.

a.      <u>Standard of Review</u>.   The governing law makes clear that credibility determinations are initially within the province of the ALJ.   <u>Driggins v. Bowen</u>, 791 F.2d 121, 125 n. 2 (8th Cir. 1986); <u>Underwood v. Bowen</u>, 807 F.2d 141, 143 (8th Cir. 1986).   As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.   See, <u>Stout v. Shalala</u>, 988 F.2d 853, 855 (8th Cir. 1993).

- 32 -

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the Plaintiff's testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony.  See, <u>Shelton v. Chater</u>, 87 F.3d 992, 995 (8th Cir. 1996); <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Ricketts v. Secretary of Health and Human Services</u>, 902 F.2d 661, 664 (8th Cir. 1990).  These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ.  <u>Johnson v. Secretary of Health and Human Services</u>, 872 F.2d 810, 814 n. 3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by <u>Polaski v. Heckler</u>, supra, and its progeny.  See, e.g., <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996); <u>Shelton v. Chater</u>, supra; <u>Jones v. Chater</u>, 86 F.3d 823 (8th Cir. 1996).  Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1.    the claimant's daily activities;

2.    the duration, frequency, and intensity of the pain;

- 33 -

3.      precipitating and aggravating factors;

4.      dosage, effectiveness and side effects of medication;

and

5.      functional restrictions.

Polaski v. Heckler, supra at 1321-22.

The ALJ must not only consider these factors, but he must list them and explain the

resolution of any demonstrable conflict or inconsistency in the Record as a whole.  Cf.,

Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991);

Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints

of pain or other subjective symptoms solely because there is no objective medical

evidence to support them.  Ostronski v. Chater, supra at 418; Jones v. Chater, supra

at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1995)(ALJ should

consider absence of objective medical basis as a factor to discount the severity of a

claimant's subjective complaints of pain).   It is also firmly established that the

physiological, functional, and psychological consequences of illness, and of injury, may

vary from individual to individual.   Simonson v. Schweiker, 699 F.2d 426 (8th Cir.

1983).  For example, a "back condition may affect one individual in an inconsequential

way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974).  Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole.  Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied.  For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling.  Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).  By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility."  Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997)(ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417

(8th Cir. 1996); <u>Shannon v. Chater</u>, supra at 487.  Among the daily activities, which

counterindicate disabling pain, are: a practice of regularly cleaning one's house,

<u>Spradling v. Chater</u>, 126 F.3d 1072, 1075 (8th Cir. 1997); <u>Chamberlain v. Shalala</u>, supra

at 1494; cooking, <u>id.</u>; and grocery shopping, <u>Johnson v. Chater</u>, 87 F.3d 1015, 1018

(8th Cir. 1996).  Although daily activities, standing alone, do not disprove the existence

of a disability, they are an important factor to consider in the evaluation of subjective

complaints of pain.  <u>Wilson v. Chater</u>, 76 F.3d 238, 241 (8th Cir. 1996).

        b.    <u>Legal Analysis</u>.  The Plaintiff argues that the ALJ improperly

discounted her testimony, by applying an incorrect legal standard.  The Plaintiff cites

the ALJ's statement, in his Opinion, that he could not "find the claimant credible that

she is incapable of all work because **the medical evidence fails to provide strong**

**support for her allegations** of disabling physical impairments."  [T. 19][emphasis

added].

Initially, we note that the Plaintiff has not specified how the Plaintiff's functional

limitations, or RFC, would have been different, had the ALJ applied a different

standard, in assessing the Plaintiff's credibility.  In fact, the Plaintiff has not challenged

the ALJ's RFC determination, or his findings concerning the Plaintiff's severe

impairments, and therefore, any such arguments have been waived.  See, <u>Craig v.</u>

<u>Apfel</u>, 212 F.3d 433, 437 (8th Cir. 2000)(finding that an argument, which is not articulated to the District Court, is forfeited).

Furthermore, despite the ALJ's questionable choice of language in that segment of his Opinion, he later engaged in an extended discussion of the Plaintiff's credibility, and noted that the Plaintiff received only conservative treatment for her cervical degenerative disc disease, and degenerative joint disease, and had been prescribed pain medication. [T. 21]. The ALJ also found that the medical record did not document any objective evidence of neurological losses, and no physical therapy, or surgery, was recommended. <u>Id.</u> Both of those factors are appropriate considerations, in determining the Plaintiff's credibility. See, <u>Chamberlain v. Shalala</u>, supra at 1494; <u>Barrett v. Shalala</u>, supra at 1023; <u>Rautio v. Bowen</u>, supra at 179; <u>Johnston v. Shalala</u>, supra at 451 (ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain).

Finally, the ALJ did not rely solely on the Plaintiff's medical treatment history, or the lack of objective medical findings. Rather, he considered the Plaintiff's activities of daily living, the lack of reported side effects from her then-current medications, and her work history. [T. 21]. We further note that the ALJ did not find the Plaintiff to be entirely incredible, but rather, he found that her subjective complaints of pain were

credible to the extent that they were consistent with her RFC, and not credible insofar as she alleged total disability.  Id.

In sum, we find that the ALJ properly discredited the Plaintiff's testimony, after thoroughly reviewing the Record as a whole, insofar as it alleged total disability.  He provided numerous reasons for discrediting the Plaintiff's subjective complaints, and those reasons, and the evidence cited, substantially support his determination in that regard.  "The ALJ is in the best position to gauge the credibility of testimony and is granted deference," Sarna v. Barnhart, 32 Fed.Appx. 788, 791 (8th Cir. 2002), and "[w]e will defer to the ALJ's findings," where, as here, "they are sufficiently substantiated by the record."  Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).  Therefore, finding no basis upon which to reverse the Plaintiff's credibility rulings, we reject that challenge to the ALJ's determination.  Furthermore, as we have previously discussed, the Plaintiff has not challenged the ALJ's determination of her RFC, and has waived any such argument.

2.   Whether the ALJ's Finding, that the Plaintiff Can Perform Other Substantial Gainful Activity, is not Supported by Substantial Evidence Due to Reliance upon Flawed Vocational Testimony; and Whether the ALJ Erred in Failing to Apply Relevant Vocational Rules which would have Led to a Finding that the Plaintiff is Disabled.

The Plaintiff argues that the ALJ could not rely on the VE's testimony, as to whether the Plaintiff possessed transferable skills, because the testimony was inconsistent with his written report, and because the "skills," which the VE identified, were so generic, that they should not qualify as skills. The Plaintiff also contends that, if she did not have any transferable skills, the Grids would have resulted in a finding of disability.[12]

The Regulations provide that "[t]he adversity of functional restrictions to sedentary work at advanced age * * * for individuals with no relevant past work or who can no longer perform vocationally relevant past work and have no transferable skills, warrants a finding of disabled." 20 C.F.R. Pt. 404, Subpt. P, App. 2, §201.00(d); see also, 20 C.F.R. §404.1568(d)(4). In defining what is meant by transferable skills, the Regulations state: "We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities that you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. §404.1568(d)(1). Further the Commissioner has issued a Ruling, which defines "skill" as "knowledge of a work activity which requires the exercise of

---

[12]The term "Grids" refers to the Medical-Vocational Guidelines. See, Appendix 2, Subpart P of the Regulations.

significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level." SSR 82-41 (1983).

        We first consider the Plaintiff's argument, that the VE's testimony was inconsistent with his report.  [T. 115, 284-89].  In the VE's report, he listed the Plaintiff's transferable skills, from her position as a data entry clerk, as entering data/keyboarding, proofreading, and maintaining records.  [T. 115].  At the Hearing, the VE testified that the Plaintiff's transferable skills were greeting, operating phones, and record-keeping.  [T. 287].  We find that the VE's testimony merely elaborated upon his earlier notations, and that such testimony was not inconsistent with his report. Furthermore, we note that the VE's testimony was consistent with the Plaintiff's description of her job, as a data processor, in which she stated, inter alia, that she answered phones, and did filing.  [T. 79].  The VE cannot possibly be precluded from testifying to anything beyond what is contained in his report.  Although the VE initially declined to modify his report, at the ALJ's invitation, he might not have anticipated being questioned directly as to the Plaintiff's transferable skills.  [T. 284].  Additionally, the VE's declining of an opportunity to make any changes to his report, occurred in the context of the Plaintiff's testimony, that she had attended beauty school, and had

- 40 -

worked in the field for a relatively brief period of time, many years earlier.  [T. 284].

Therefore, it is reasonable to infer that the VE declined to make changes, in terms of

the Plaintiff's past relevant work, and not in terms of the skills that her previous jobs

entailed.

Next, the Plaintiff contends that the identified skills -- namely, greeting, operating

the telephones, and record-keeping -- are not actually skills, but rather, they are

aptitudes or traits, which are possessed by many individuals, regardless of their work

experience.  We disagree.  In Surkand v. Barnhart, 2001 WL 1518292 at *4 (E.D. La.,

November 28, 2001), the Court disagreed with the plaintiff's contention that use of a

phone, and interaction with others, were aptitudes or proficiencies, because they were

"common to most persons."  The Court elaborated, as follows:

> Viewed in isolation, operating the phone, is, of course, a
> widely-held ability.  But the ALJ's finding obviously
> contemplated not just general use of the phone, but rather
> Plaintiff's use of the phone in a business setting, where it is
> necessary not only to physically operate a phone, but also to
> handle callers professionally, to efficiently direct them to the
> appropriate destination, and to communicate clearly both
> with them and the call's intended recipient. * * * Thus, use
> of the phone in the setting at issue her constitutes a skill.

Id. at *4, citing Anglin v. Massanari, 2001 WL 1002820 at *2 (9th Cir., August 30,
2001).

The Court also stated that "[u]se of the phone and interaction with others * * * implicate[s] a complexity of tasks surpassing mere physical labor," and "they are properly characterized as skills." Id. at 5.

Applying the Court's rationale here, we find that the ALJ did not erroneously consider the Plaintiff's operation of the telephones a "skill," within the meaning of the Regulations.  We further find that record keeping is also a skill.  See, Wilkerson v. Sullivan, 956 F.2d 279, 1992 WL 33220 at *3 (10th Cir. February 19, 1992) ("Recordkeeping is a skill," even though, when it is "broken down into its components recordkeeping is no more than reading and writing."), citing Ingle v. Heckler, 763 F.2d 169, 170 (4th Cir. 1985).  Specifically, we note that the VE did not testify that the skill of record-keeping, as it was performed in the Plaintiff's prior job as a data processor, involved only the taking of messages, but rather, he testified that, in the context of a job as an information clerk, and as a receptionist, record-keeping would primarily occur in the taking of messages.  [T. 287].  In defining a transferable skill, the focus is on the "the skilled or semi-skilled work activities that you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."  20 C.F.R. §404.1568(d)(1).  It is not necessary that the subsequent job maintain the same level of skill.  In fact, the Regulations state that transferability "is

most probable and meaningful among jobs in which -- (I) the same **or a lesser degree of skill** is required."   20 C.F.R. §404.1568(d)(2)(I) [emphasis added].

Finally, we note that the Plaintiff did not argue that the Plaintiff's skills were not transferable, that they were not acquired through the performance of a job that is above an unskilled position, or that minimal vocational adjustment was required, nor did the Plaintiff challenge the VE's characterizations of the positions as semi-skilled. Therefore, the Plaintiff has waived any such arguments.   See, Craig v. Apfel, supra at 437.   In any event, we find that the ALJ's determinations, in those respects, is supported by substantial evidence in the Record as a whole.   Therefore, finding no error in this, or in any other respect, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's cross-Motion be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Plaintiff's Motion for Summary Judgment[13] be denied.

---

[13]The Plaintiff's Motion for Summary Judgment has not been assigned a Docket Number, because it was attached to the Memorandum in Support of the Motion, which was entered as a "Brief," in the electronic filing system.

2.     That the Defendant's Motion [Docket No. 9] for Summary Judgment be granted.

Dated: February 14, 2005          s/Raymond L. Erickson
                                  Raymond L. Erickson
                                  UNITED STATES MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 4, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 4, 2005**, unless all interested parties

- 44 -

stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.